IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

KAREN EDGETT, as the Personal
Representative of the Estate of Arthur
Edgett, Deceased;

Plaintiff,

vs.

UNION PACIFIC RAILROAD COMPANY,

Defendant.

8:18CV407

MEMORANDUM & ORDER

This matter is before the Court on defendant Union Pacific Railroad Company's ("U.P.") motion for partial summary judgment pursuant to Fed. R. Civ. P. 56, Filing No. 45, and motion to exclude expert testimony under *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 589 (1993), Filing Nos. 47 and 49. This is an action under the Federal Employers' Liability Act ("FELA"), 45 U.S.C. § 51 *et seq*. The decedent, Arthur Edgett, worked as a brakeman/conductor at U.P., and/or its predecessors-in-interest, from 1974 to 2004. His estate alleges that while he was employed at U.P., he was negligently exposed to various toxic substances and carcinogens including diesel fuel/exhaust that caused or contributed to his development of lung cancer, which led to his death.

The defendant argues that the expert's opinions are unreliable under *Daubert* and Drs. Perez and Newman's opinions and testimony may not be relied upon because they do not meet the requirements of Fed. R. Evid. 702 and do not employ a reliable scientific

1

methodology in reaching their opinions.  The defendant also contends that the plaintiff's action, filed on August 24, 2018, is time-barred as a matter of law because undisputed evidence shows that the action was filed more than three years after he was diagnosed with lung cancer on August 21, 2015.  The defendant bases their motion on the limitations date being the date Edgett's biopsy results were processed and received by the diagnosing doctor.  The plaintiff contends that the date that Edgett was actually given the results of the biopsy and diagnosed with lung cancer was a roughly a week later, placing the suit within the required three-year period.

## I.      BACKGROUND

Dr. Hernando Perez is an industrial hygiene and occupational health expert who opined on Edgett's workplace exposure to diesel exhaust and its component, benzene. Filing No. 61, Ex. 3, Report by Dr. Perez.  Dr. Perez has a Ph.D. in industrial hygiene from Purdue University and a Master of Public Health degree in environmental and occupational health from Emory University.  *Id.* at 2.  He is certified in the comprehensive practice of industrial hygiene by the American Board of Industrial Hygiene and in the practice of safety by the Board of Certified Safety Professionals.  *Id.*  He has been employed as Lead Industrial Hygienist and Environmental Hygiene Program Manager for United States Citizenship and Immigration Services in the United States Department of Homeland Security since 2015.  *Id.*  In that capacity, he is responsible for coordination and performance of industrial hygiene activities at all USCIS facilities across the United States.  *Id.*  He was employed as a full time faculty at the Drexel University School of Public Health from 2004 to 2014 and as Director of the Industrial Hygiene Consulting Service at the School from 2006 to 2014.  *Id.*

2

In this case, Dr. Perez was asked to offer opinions on Arthur Edgett's working conditions. Filing No. 61, Ex. 3, Perez Report at 1. Dr. Perez interviewed co-workers of Edgett's, reviewed Edgett's employment history and job duties, and performed a literature review. *Id.* at 3-4. He reviewed various journal articles, standard textbooks, and information from OSHA, NIOSH, EPA, ATSDR, MSHA, National Cancer Institute (NCI), National Institute of Environmental Health Sciences (NIEHS), and International Agency for Research on Cancer (IARC). *Id.* at 1. He relied on data from studies in diesel exposure.[1] *Id.*

Dr. Perez states that Edgett experienced chronic exposure to diesel exhaust during his entire thirty-year career as a brakeman and conductor for Union Pacific and his average exposure while performing duties for Union Pacific were consistent with those in low to intermediate range of exposed occupations. Filing No. 61, Ex. 3, Perez Report at 4. Based on his evaluation and his education and experience in the field, Dr. Perez states that U.P. failed to provide a reasonably safe place to work in failing to provide air monitoring or otherwise determine Edgett's level of exposure to diesel exhaust; failing to provide Edgett with appropriate personal protective equipment; failing to implement any administrative or engineering controls to reduce or prevent diesel exhaust exposure; and failing to provide adequate warnings, training, and information about the hazards of diesel exhaust. *Id.* at 11. Dr. Perez further opines that U.P. failed to comply with the OSHA Hazard Communication Standard, and the OSHA General Duty Clause, OSHA Act Section 5(a)(1). *Id.* Dr. Perez concluded that U.P.'s actions fell beneath a reasonable standard of care. *Id.*

---

[1] Anjoeka Pronk, et al., *Occupational Exposure to Diesel Engine Exhaust: A Literature Review*, 19 Journal of Exposure Science and Environmental Epidemiology at 443-457 (2009) ("Pronk").

Dr. Stephen Newman is an internal medicine physician that who opined on the causation of Edgett's cancer diagnosis.  Filing No. 51, Ex. 10, Expert Report of Dr. Stephen Newman.  Dr. Newman has a B.A. from Trinity College, a M.D. from Albert Einstein College of Medicine, and an M.B.A. from Rutgers.  *Id.* at 4.  Dr. Newman also holds various Board Certifications in Internal Medicine, Pulmonary Disease, Critical Care Medicine, the American Board of Sleep Medicine, and the American Board of Independent Medical Examiners.  *Id.*  Dr. Newman has held a position as an Assistant Professor of Medicine at McGill University, is currently an ILO Grade B Reader for the National Institute of Occupational Safety and Health, and serves as the Chapter Representative of the American College of Physicians to the United States Senate and House of Representatives.  *Id.*  In that position he is responsible for coordinating efforts to present the case of the American College of Physicians to the United States Senate and House of Representatives.  *Id.*

In this case, Dr. Newman was asked to offer opinions on the causation of Edgett's cancer diagnosis and whether longstanding and continuous exposure to diesel exhaust in a work environment could have contributed to a diagnosis of lung cancer.  Filing No. 58 at 9.  In doing so, he relied upon Edgett's medical records, Dr. Perez's report, and peer-reviewed literature to formulate his expert opinion.  *Id.* at 7.  Dr. Newman also relied on data from studies in diesel and asbestos exposure.[2]  Filing No. 61, Ex. 5, Deposition of Dr. Newman at 7.

Dr. Newman states that Edgett experienced daily exposure to a wide variety of substances during his entire thirty-year career as a brakeman and conductor for Union

---

[2] Howe, Fraser, Lindsay, et al., *Cancer Mortality (1965-77) in Relation to Diesel Fume and Coal Exposure in a Cohort of Retired Railway Workers*, 70 Journal of the National Cancer Institute 1015-1019 (1983).

Pacific. Filing No. 51, Ex. 10 at 3. Based on his evaluation, education, and experience in the field, Dr. Newman states within a reasonable degree of medical certainty Edgett developed, suffered, and died from a cancer of the lung that was the result of unprotected cumulative occupational exposure to a substances from diesel fumes to asbestos. *Id.* at 2.

The decedent was diagnosed with stage four lung cancer in 2015 and discussed it with his doctor. Filing No. 36, Ex. 2, at 20. By the time the lung cancer had been diagnosed, it had metastasized in Edgett's brain. *Id.* at 21. Edgett did not undergo any chemotherapy or radiation therapy and was admitted into hospice in November of 2015. *Id.* at 20. According to Edgett's wife, Edgett was diagnosed with lung cancer a week or so after the biopsy was performed on August 20, 2015. *Id.* The spread of the cancer from his lungs to his brain was discussed with Edgett and his wife, but Mrs. Edgett does not recall any conversations with the doctors regarding what may have caused his lung cancer. *Id.* at 21. Mrs. Edgett also does not recall whether she and her husband discussed what might have caused his lung cancer. *Id.* Edgett died on November 12, 2015. Filing No. 38, Ex. 1. Mrs. Edgett was not made aware that Edgett's cancer could have been caused by his employment at the railroad until sometime in 2016. Filing No. 36, Ex. 2, at 21.

## II.   STANDARD OF REVIEW

### A.  Summary Judgment

Summary judgment is appropriate when, viewing the facts and inferences in the light most favorable to the nonmoving party, "the pleadings, the discover and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material

fact and that the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(c). The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celeotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "The movant 'bears the initial responsibility of informing the district court of the basis for its motion,' and must identify 'those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact.'" Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (quoting Celeotex, 477 U.S at 323). If the movant does so, "the nonmovant must respond by submitting evidentiary materials that set out 'specific facts showing there is a genuine issue for trial." Id. (quoting Celeotex, 477 U.S. at 324). If "reasonable minds could differ as to the import of the evidence," summary judgment should not be granted. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251 (1986).

The evidence must be viewed in the light most favorable to the nonmoving party, giving the nonmoving party the benefit of all reasonable inferences. Kenney v. Swift Transp., Inc., 347 F.3d 1041, 1044 (8th Cir. 2003). "In ruling on a motion for summary judgment, a court must not weigh evidence or make credibility determinations." Id.

B. Expert Testimony

Federal Rule of Evidence 702 governs the admissibility of expert testimony and requires that: "(1) the evidence must be based on scientific, technical or other specialized knowledge that is useful to the finder of fact in deciding the ultimate issue of fact; (2) the witness must have sufficient expertise to assist the trier of fact; and (3) the evidence must

be reliable or trustworthy." *Kudabeck v. Kroger Co.*, 338 F.3d 856, 859 (8th Cir. 2003). When faced with a proffer of expert testimony, trial judges are charged with the "gatekeeping" responsibility of ensuring that all expert evidence admitted is both relevant and reliable. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999); *Daubert*, 509 U.S. at 589; *United States v. Merrell*, 842 F.3d 577, 582 (8th Cir. 2016). The proponent of expert testimony bears the burden of providing admissibility by a preponderance of the evidence. *Lauzon v. Senco Prods.*, 270 F.3d 681, 686 (8th Cir. 2001).

Testimony is relevant if it is "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Daubert*, 509 U.S. at 591. In the Eighth Circuit, a district court should apply a three-part test when screening expert testimony under Rule 702:

> First, evidence based on scientific, technical, or other specialized knowledge must be useful to the finder of fact in deciding the ultimate issue of fact. This is the basic rule of relevancy. Second, the proposed witness must be qualified to assist the finder of fact. Third, the proposed evidence must be reliable or trustworthy in an evidentiary sense, so that, if the finder of fact accepts it as true, it provides the assistance the finder of fact requires.

*Lauzon*, 270 F.3d at 686 (internal citations and quotations omitted). Expert testimony assists the trier of fact when it provides information beyond the common knowledge of the trier of fact. *Kudabeck*, 338 F.3d at 860.

To satisfy the reliability requirement, the party offering the expert testimony must show by a preponderance of the evidence "that the methodology underlying [the expert's] conclusions is scientifically valid." *Barrett v. Rhodia, Inc.*, 606 F.3d 975, 980 (8th Cir. 2010) (citations omitted). In making the reliability determination, the court may consider:

> (1) Whether the theory or technique can be or had been tested; (2) whether the theory or technique has been subjected to peer review or publication; (3) whether the theory or technique has a known or potential error rate and

standards controlling the technique's operations; and (4) whether the theory or technique is generally accepted in the scientific community. *Russell v. Whirlpool Corp.*, 702 F. 3d 450, 456 (8th Cir. 2012). Additional factors to consider include: "whether the expertise was developed for litigation or naturally flowed from the expert's research; whether the proposed expert rules out other alternative explanations; and whether the proposed expert sufficiently connected the proposed testimony with the facts of the case." *Polski v. Quiglet Corp.*, 538 F.3d 836, 839 (8th Cir. 2008) (quoting *Sappington v. Skyjack, Inc.*, 512 F.3d 440, 449 (8th Cir. 2008)). "This evidentiary inquiry is meant to be flexible and face specific, and a court should use, adapt, or reject" these factors as the particular case demands. *Russell v. Whirlpool*, 702 F.3d at 456 (citation omitted).

When making the reliability inquiry, the court should focus on "principles and methodology, not the conclusions that they generate." *Kuhn v. Wyeth, Inc.*, 686 F.3d 618, 625 (8th Cir. 2012). However, "conclusions and methodology are not entirely distinct from one another. Trained experts commonly extrapolate from existing data." *Gen. Elec. Co. v. Joiner*, 118 S. Ct. 512, 519 (1997); *see also Russell v. Ill. Cent. R.R. Co.*, No. W2013-02453-COA-R3-CV, 2015 WL 4039982, at *6 (Tenn. Ct. App. June 30, 2015) (finding the expert doctor's causation conclusions based on peer-reviewed scientific studies were not an improper extrapolation—his trial testimony was supported by a rational explanation that reasonable persons could accept as more correct than not correct).

In applying the reliability requirement of *Daubert*, the Eighth Circuit draws a distinction between challenges to the application of that scientific methodology. *United States v. Gipson*, 383 F.3d 689, 696 (8th Cir. 2004). "When the *application* of a scientific methodology is challenged as unreliable under *Daubert* and the methodology itself is

sufficiently reliable, outright exclusion of the evidence is warranted only if the methodology 'was so altered by a deficient application as to skew the methodology itself." *Id.* at 697 (emphasis in original) (quoting *United States v. Martinez*, 3 F.3d 1191, 1198 (8th Cir. 1993)).  Generally, deficiencies in application go to the weight of the evidence, not its admissibility.  *See id.*  "As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." *Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 929 (8th Cir. 2001) (quoting *Hose v. Chicago Nw. Transp. Co.*, 70 F.3d 968, 976 (8th Cir. 1995)).

"Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.  "[C]ases are legion" in the Eighth Circuit that "call for the liberal admission of expert testimony." *Johnson v. Mead Johnson & Co., LLC*, 754 F.3d 557, 562 (8th Cir. 2014).  "As long as the expert's scientific testimony rests upon 'good grounds, based on what is known' it should be tested by the adversary process with competing expert testimony and cross-examination, rather than excluded by the court at the outset." *Id.* (quoting *Daubert*, 509 U.S. at 590).

District courts are "not to weigh or assess the correctness of competing expert opinions." *Id.*  The jury, not the trial court, should be the one to 'decide among the conflicting views of different experts." *Kumho Tire Co.*, 526 U.S. at 153.  Medical experts often disagree on diagnosis and causation and questions of conflicting evidence must be left for the jury's determination. *Hose*, 70 F.3d at 976.

9

C.  The FELA

Railroads are liable in damages for an employee's "injury or death resulting in whole or in part from the Railroad's negligence." 45 U.S.C. § 51.  Appraising negligence under FELA "turns on principles of common law . . . , subject to such qualifications [that] Congress" introduces. *Consolidated Rail Corp. v. Gottshall*, 512 U.S. 532, 543-44 (1994) (noting the qualifications are the modification or abrogation of several common-law defenses to liability, including contributory negligence and assumption of risk). The FELA is to be liberally construed, but it is not a workers' compensation statute, and the basis of liability is "negligence, not the fact that injuries occur." *Id.* At 543.

FELA imposes upon employers a continuous duty to provide a reasonably safe place to work. *Cowden v. BNSF Ry. Co.*, 690 F.3d 884, 889 (8th Cir. 2012).  The railroad's duty to provide a safe workplace is a duty of reasonable care. *CSX Transp., Inc. v. McBride*, 564 U.S. 685, 703 (2011).

However, "a relaxed standard of causation applied under FELA." *Gottshall*, 512 U.S. at 543; *see Holloway v. Union Pac. R.R. Co.*, 762 F. App'x 350, 352 (8th Cir. 2019). The test is simply whether the railroad's negligence played a part—no matter how small— in bringing about the injury. *McBride*, 564 U.S. at 705; *see also Paul v. Mo. Pac. R.R. Co.*, 963 F.2d 1058, 1061 (8th Cir. 1992) (stating that "[u]nder FELA, the plaintiff carries only a slight burden on causation."); *Fletcher v. Union Pac. R.R. Co.*, 621 F.2d 902, 909 (8th Cir. 1980) ("The test of causation under the FELA is whether the railroad's negligence played any part, however small, in the injury which is the subject of the suit.").  In FELA

cases the negligence of the defendant need not be the sole cause or whole cause of the plaintiff's injuries.[3]  *Claar v. Burlington N. R.R. Co.*, 29 F.3d 499, 503 (9th Cir. 1994).

Despite the lower causation standard under FELA, a plaintiff must still demonstrate some causal connection between a defendant's negligence and his or her injuries. *Brooks v. Union Pac. R.R. Co.*, 620 F.3d 896, 899 (8th Cir. 2010).  In order to avoid summary judgment, a FELA plaintiff is required to produce admissible evidence that the railroad's negligence played a part in causing his alleged injury.  *Id.*  If an injury has "no obvious origin, 'expert testimony is necessary to establish even that small quantum of causation required by FELA.'"  *Brooks*, 620 F.3d at 899 (quoting *Clarr*, 29 F.3d at 504); *see also Mayhew v. Bell S.S. Co.*, 917 F.2d 961, 963 (6th Cir. 1990) ("[A]lthough a [FELA] plaintiff need not make a showing that the employer's negligence was the sole cause, there must be a sufficient showing (i.e. more than a possibility) that a causal relation existed.").

"The standard of causation under FELA and the standards for admission of expert testimony under the Federal Rules of Evidence are distinct issues and do not affect one another." *Claar*, 29 F.3d at 503.  *Daubert's* standards for determining the admissibility of expert testimony apply regardless of whether the plaintiff's burden to prove causation is reduced. *Wills v. Amerada Hess Corp.*, 379 F.3d 32, 47 (2d Cir. 2004) (involving Jones Act and stating that "the standards for determining the reliability and credibility of expert testimony are not altered merely because the burden of proof is relaxed"); *see also Taylor v. Consol. Rail Corp.*, No. 96-3579, 114 F.3d 1189 (Table), 1997 WL 321142, at *6-7 (6th

---

[3] In Contrast, "[t]o establish causation in a common law negligence action, a plaintiff generally must show that the defendant's conduct was a 'substantial factor in bringing about the harm.'" *Tufariello v. Long Island R. R. Co.*, 458 F.3d 80, 87 (2d Cir. 2006) (quoting Restatement 2d of Torts § 431(a)).

Cir. June 11, 1997) (noting it is well established that the admissibility of expert testimony is controlled by *Daubert*, even in FELA cases); Hose, 70 F.3d at 976 (applying *Daubert* in a FELA case).[4]

A differential diagnosis is "an alternative method of establishing causation," one which may be utilized where the particular facts of the case do not lend themselves to quantitative analysis.[5] Hardyman v. Norfolk & W. Ry. Co., 243 F.3d 255, 261 (6th Cir. 2001) (rejecting defendant railroad's argument that the only way the plaintiff could establish causation would be with the proffer of a known "dose/response relationship" or "threshold phenomenon[,]"); *see also* Russell v. Ill. Cent. R.R., No. W2013-02453-COA-R3-CV, 2015 WL 4039982 at *4 (finding that the process of considering all relevant potential causes of a plaintiff's cancer and eliminating alternative causes produces a reliable opinion). "In performing a differential diagnosis, a physician then 'rules in' all scientifically plausible causes of the plaintiff's injury. The physician then 'rules out' the least plausible causes of injury until the most likely cause remains." Glastetter v. Novartis Pharm. Corp., 252 F.3d 986, 989 (8th Cir. 2001). A reliable differential diagnosis typically, though not invariably, is performed after "physical examinations, the taking of medical histories, and the review of clinical tests, including laboratory tests," but "[a] doctor does not have to employ all of these techniques in order for the doctor's diagnosis to be reliable"

---

[4] That is not to say that the lower standard of proof has no effect on a *Daubert* inquiry. *Daubert's* relevancy inquiry (that is, whether the evidence assists the trier of fact) may be affected by the reduced statutory burden of proof. Wills, 379 F.3d at 47; *see* Daubert v. Merrell Down Pharms., Inc., 43 F.3d 1311, 1321 (9th Cir. 1995) (on remand from the Supreme Court) (stating that where the pertinent inquiry is whether the proffered expert testimony "will assist the trier of fact" in determining causation, the court looks to the governing substantive standard).

[5] Courts sometimes fail to distinguish between differential diagnosis and differential etiology. King, 762 N.W.2d at 49. Differential diagnosis refers to a physician's "determination of which one of two or more diseases or conditions a patient is suffering from, by systematically comparing and contrasting their clinical findings." Id. "In contrast, etiology refers to determining the causes of a disease or disorder." Id. at 49-50.

and "[a] differential diagnosis may be reliable with less than all the types of information set out above." *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 807 (3d Cir. 1997).

In the Eighth Circuit, differential diagnosis is a tested methodology, has been subjected to peer review/publication, does not frequently lead to incorrect results, and is generally accepted in the medical community). In fact, the Eighth Circuit has "termed an opinion [based on differential diagnosis] 'presumptively admissible,' noting that a district court may not exclude such expert testimony unless the diagnoses are 'scientifically invalid.'" *Id.* Also, the Eighth Circuit has "consistently ruled that experts are not required to rule out all possible causes when performing the differential etiology analysis." *Id.* at 563.

Under general negligence principles, in a toxic tort case, "at a minimum . . . there must be evidence from which the factfinder can conclude that the plaintiff was exposed to levels of [the toxic agent at issue] that are known to cause the kind of harm that the plaintiff claims to have suffered." *Mattis v. Carlon Elec. Prods.*, 295 F.3d 856, 860 (8th Cir. 1996) (under Arkansas law, applying a proximate cause standard that required evidence from which a responsible person could conclude that a defendant's emission had *probably caused* harm in order to recover). However, even under common-law negligence standards, a plaintiff does not need to produce a "mathematically precise table equating levels of exposure with levels of harm" to show that he was exposed to a toxic level of a chemical, but must only present "evidence from which a reasonable person could conclude that his exposure *probably caused* his injuries." *Bonner*, 259 F.3d at 928 (emphasis added). "[W]hile precise information concerning the exposure necessary to cause specific harm to humans and exact details pertaining to the plaintiff's exposure are

beneficial, [it must be recognized that] such evidence is not always available, or necessary, . . . and need not invariably provide the basis for an expert's opinion on causation." *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 264 (4th Cir. 1999) (involving strict liability, breach of warranty, and negligence action).

In the context of the FELA, a plaintiff need not necessarily prove the levels of a toxin to which he or she was exposed.  *See Hardyman*, 243 F.3d at 262-66 (reversing trial court's ruling that plaintiff could establish causation only by showing a "dose/response relationship" between exposure levels and risk of disease and finding that an expert need not possess specific dosage information in order to testify about causation in a FELA case); *Harbin v. Burlington N. R.R. Co.*, 921 F.2d 129, 132 (7th Cir. 1990) (finding a plaintiff need not identify the specific composition and density of soot present in his work environment to survive a summary judgment—although "expert testimony documenting the hazards posed by the presence of so many parts per million of soot in the air would certainly enhance [the plaintiff's] case, it is not essential under the regime of the [FELA]."); *Higgins v. Consol. Rail Corp.*, No. 1:06-CV-689 GLS/DRH, 2008 WL 5054224, at *4 (N.D.N.Y. Nov. 21, 2008) (finding an issue of fact as to causation even if expert testimony had been excluded because due to the slight burden of proof in FELA actions, and stating that a jury may make inferences in a FELA case that it otherwise could not); *Sunnycalb v. CSX Transp., Inc.*, 926 F. Supp. 2d 988, 995-96 (S.D. Ohio 2013) (finding that the plaintiff's inability to establish a precise level of chemical exposure did not bar recovery under FELA—the evidence was sufficient for the jury to draw the reasonable inference that CSX's negligence played a part in the plaintiff's injuries); *Payne v. CSX Transp., Inc.*, 467 S.W.3d 413, 457 (Tenn. 2015) ("[S]tated simply, the Plaintiff's experts were not

required to establish 'a dose exposure above a certain amount' before they could testify about causation."); and *Russell v. Ill. Cent. R.R.*, No. W2013-024530COA-R3-CV, 2015 WL 4039982 (rejecting defendant railroad's contention that the expert doctor's opinions were not reliable because the differential diagnoses on which they were based "did not consider the dose, frequency or duration" of the plaintiff's exposure to carcinogens at work).

D. Statute of Limitations

The statute of limitations for FELA actions is three years from the day the cause of action accrued. 45 U.S.C. § 56. Where a claimant has no reason to know of his injury when it is sustained, his cause of action under the FELA does not accrue, and limitations therefore do not begin to run, until the claimant becomes aware that he has been injured *and* that his injury is work related. *Urie v. Thompson*, 337 U.S. 163, 169 (1949) (emphasis added). When the injury is not a single traumatic one with immediate symptoms, but rather a latent one with symptoms appearing over time, "'the cause of actions does not accrue until the employee is aware or should be aware of his condition.'" *White v. Union Pac. R.R. Co.*, 867 F.3d 997, 1001 (8th Cir. 2017) (quoting *Fletcher v. Union Pac. R.R. Co.*, 621 F.2d 902, 906 (8th Cir. 1980)). In a case involving exposure to a toxin, "'inasmuch as the injurious consequences of the exposure are the product of a period of time rather than a point of time . . . the afflicted employee can be held to be "injured" only when the accumulated effects of the deleterious substance manifest themselves[.]'" *Urie*, 337 U.S. at 170 (quoting *Associate Indem. Corp. v. Industrial Accident Comm'n*, 12 P.2d 1075, 1076 (Cal. Dist. Ct. App. 1932)). Generally, a plaintiff will know he has been injured "when his condition is diagnosed, unless it is shown that the plaintiff 'should have known'

at an earlier date that he was injured." *Young v. Clinchfield R.R. Co.*, 288 F.2d 499, 503 (4th Cir. 1961).

The employee must also know, or have reason to know, the condition's cause. *White*, 867 F.3d at 1001; *see also Mix v. Del. & Hudson Ry. Co.*, 345 F.3d 82, 90 (2d Cir. 2003); *Campbell v. Grand Truck W.R.R. Co.*, 238 F.3d 772, 775 (6th Cir. 2001); *Albert v. Maine Cent. R. Co.*, 905 F.2d 541, 544 (1st Cir. 1990); *Townley v. Norfolk & W. Ry. Co.*, 887 F.2d 498, 500 (4th Cir. 1989); *Kichline v. Consol. Rail Corp.*, 800 F.2d 356, 360 (3d Cir. 1986); *DuBose v. Kansas City S. Ry. Co.*, 729 F.2d 1026, 1030 (5th Cir. 1984) (all holding that the statute of limitations begins to run when the employee becomes aware not only of his disease but also of its cause). "Any plaintiff who is blamelessly ignorant of existence or cause of his injury shall be accorded the benefits of the discovery rule." *Stoleson v. United States*, 629 F.2d 1265, 1269 (7th Cir. 1980) (involving an FTCA applying the same discovery rule). The discovery rule is applied in federal question cases whenever a plaintiff is not aware of and has no reasonable opportunity to discover the critical facts with respect to his injury and its cause. *Townley*, 887 F.2d at 501.

When a plaintiff discovers or, in the exercise of reasonable diligence, should discover the "critical facts" of injury and cause, the statute then begins to run—"accrual" of a claim need not "await awareness by the plaintiff that his injury was negligently inflicted." *United States v. Kubrick*, 444 U.S. 111, 123 (1979); *see also White*, 867 F.3d at 1002-03 (stating that once a condition manifests itself, the question becomes whether the plaintiff knew or, through the exercise of reasonable diligence, should have known of the cause of his injury). A claim accrues when one reasonably should know that his symptoms are fairly attributable to a workplace injury. *White*, 867 F.3d at 1003. This rule

imposes on injured plaintiffs an affirmative duty to investigate the potential cause of a known injury. *Tolston v. Nat'l R.R. Passenger Corp.*, 102 F.3d 863, 865 (7th Cir. 1996).

Both knowledge of the injury and of its governing cause require an objective inquiry into when a claimant knew or should have known, in the exercise of reasonable diligence, the "'essential facts of injury and cause.'" *White*, 867 F.3d at 1001 (quoting *Fries v. Chi. & Nw. Transp. Co.*, 909 F.2d 1092, 1095 (7th Cir. 1990)). All that is required is that the plaintiff know or have reason to know of a potential cause—actual knowledge of causation is not necessary to a finding that a cause of action has accrued. *Fries*, 909 F.2d at 1096. A plaintiff in possession of the critical facts that he has been hurt and who has inflicted the injury "can protect himself by seeking advice in the medical and legal community." *Kubrick*, 444 U.S. at 123.

"When a plaintiff may be charged with awareness that his injury is connected to some cause should depend on factors including how many possible causes exist and whether medical advice suggests an erroneous causal connection or otherwise lays to rest a plaintiff's suspicion regarding what caused his injury." *Dubose*, 729 F.2d at 1031 (discussing constructive knowledge). A two-part analysis governs whether a plaintiff reasonably should have known of his or her claim. *O'Connor v. Boeing N. Am., Inc.*, 311 F.3d 1139, 1151-52 (9th Cir. 2002). The goal of the analysis is to evaluate when a reasonable person would have connected his or her symptoms to their alleged cause. *Id.* at 1152. The first consideration is whether a reasonable person in the plaintiffs' situation would have expected to inquire about the cause of his or her injury in the first place. *Id.* at 1150 (referring to inquiry notice and "whether a reasonable person would have inquired about the cause of his injury in light of public knowledge and publicity). "Particularly when

a plaintiff has cancer, the answer to [the question whether a plaintiff could reasonably have been expected to make an inquiry] may depend on whether there are a number of potential causes." *Id.* Because "'there are many suspected causes of cancer, including those that are natural or non-negligent and would not give rise to a legal cause of action,'" a plaintiff, "'on learning that he has cancer, lacks the usual incentive to investigate the possibility that the known injury may give rise to a legal claim.'" *Id.* (quoting *Maughan v. SW Servicing, Inc.*, 758 F.2d 1381, 1385 (10th Cir. 1985); *cf. Fries*, 909 F.2d at 1096 (rejecting "the idea that when a plaintiff suspects several causes, the cause of action does not accrue until the governing, or even most probable, cause is known").

If the facts indicate a plaintiff is on inquiry notice, the second consideration is "whether [an inquiry] would have disclosed the nature and cause of plaintiff's injury so as to put him on notice of his claim." *Id.*; *see also Maughan v. SW Servicing, Inc.*, 758 F.2d 1381, 1389 (10th Cir. 1985) (finding a genuine issue of material fact on the question of when the plaintiffs knew or should have known of the facts constituting their cause of action and stating that a cumulation of public information linking radiation and leukemia insufficient as a matter of law to put a reasonably diligent plaintiff on notice to investigate, where the plaintiffs had asked their doctors what had caused the leukemia and were told that the cause was unknown). This second step "focuses on whether, if the Plaintiffs had inquired about the cause of their illnesses, the result of that inquiry would have provided Plaintiffs with knowledge of the connections between the injury and its cause." *O'Connor*, 311 F.3d at 1155-56.

Subjective suspicion that an illness was work-related is not necessarily enough to trigger accrual of a limitations period. *Stoleson*, 629 F.2d at 1267. Fixing the time of

accrual at a time of a plaintiff's suspicion when medical science did not at that time recognize the causal connection, "would provide [plaintiff] with nothing more than a delusive remedy." *Id.*; *see also Bayless v. United States*, 767 F3d 958, 967-68 (10th Cir. 2014) (finding that, despite her suspicions over sixteen years a claimant suffering from a mysterious debilitating illness did not know, or have reason to know, that her illness was caused by exposure to nerve gas until she received results of a test that caused her doctor to diagnose her with toxic encephalopathy from exposure to toxins in the workplace); *see also Rosales v. United States*, 824 F.2d 799, 805 (9th Cir. 1987) ("Ordinarily, a plaintiff cannot be expected to discover the general medical cause of his injury even before the doctors themselves are able to do so."); *Nicolazzo v. United States*, 786 F.2d 454, 456 (1st Cir. 1986) ("It was only when [the plaintiff] received a correct diagnosis . . . that the factual predicate of his injury . . . became known to him."); *Osborn v. United States*, 918 F.2d 724, 733 (8th Cir. 1990) (rejecting the government's argument that the plaintiff's mother should have known the cause of plaintiff's seizure "when the doctors, including specialists . . . had not yet reached a conclusion"); *Harrison v. United States*, 708 F.2d 1023, 1028 (5th Cir. 1983) (statute tolled because "[i]t would be unreasonable to hold [a plaintiff] to a higher degree of medical competence and understanding than the many medical experts she consulted."). Thus, there is a legal distinction between one's own suspicion that something is a cause and the requisite objective knowledge that begins the accrual clock. *See Bayless*, 767 F.3d at 967. While in some circumstances a lay person's suspicion might be sufficient to trigger the statute, it cannot do so when a plaintiff confronts "demonstrable evidence debunking her own suspicions." *Id.* at 969-70. Nonetheless, "compelling" or "certain" proof of a cause is not

a requirement before accrual may begin, nor does a plaintiff in every case need medical or scientific confirmation of a cause before the statute of limitation begins. *Id.*; *see, e.g.,* *Kronisch v. United States*, 150 F.3d 112, 123 (2d Cir. 1998); *Nemmers v. United States*, 795 F.2d 628, 631 (7th Cir. 1986). Whether there exists a "medically recognized and documented causal link between the employee's symptoms and his working conditions," is one factor to consider. *Stoleson*, 629 F.2d at 1267.

Application of the discovery rule involves determining what the plaintiff knew or should have known, which is a factual question that is appropriate for the trier of fact. *Granfield v. CSX Transp., Inc.*, 597 F.3d 474, 482 (1st Cir. 2010); *see also Genereux v. Am. Beryllia Corp.*, 577 F.3d 360, 360 (1st Cir. 2009) (stating that determining when a plaintiff had notice of the likely cause of an injury is an example of such a factual determination); *Green v. CSX Transp., Inc.*, 414 F.3d 758, 764 (7th Cir. 2005) (finding a fact question on whether the plaintiff's intermittent pain in her shoulder would have been sufficient to put a reasonable person on notice that she had suffered a cognizable work-related injury); *Smith v. States Marine Int'l, Inc.*, 864 F.2d 410, 412 (5th Cir. 1989) (finding an issue of fact on whether the plaintiff should have appreciated that his hearing loss was attributable to long-term exposure to loud noises).

## III.   DISCUSSION

The Court first finds the defendant's motion to exclude the testimony of Dr. Perez and Dr. Newman should be denied. Both experts are clearly qualified to render their opinions and their opinions are relevant and reliable enough to pass muster under Rule 702 and *Daubert*.

The Court rejects the defendant's contention that Dr. Perez and Dr. Newman did not employ a reasonable scientific methodology to reach their opinions.  To the contrary, Dr. Newman testified that he read and relied on Dr. Perez's report, which contained information on exposure gleaned from an extensive interview with Edgett's co-workers, as well as discussion of studies of exposure involving railroad workers and similar occupations.  Dr. Newman based his testimony on materials furnished by the plaintiff's attorney, on the report of Dr. Perez, a review of the literature, and his extensive knowledge, experience, and expertise.  Based on that evidence, he testified that Edgett's exposure to benzene in diesel exhaust was above that which would be considered a background exposure.  He properly extrapolated his opinion that exposure to diesel exhaust contributed to Edgett's lung cancer.

A differential diagnosis is a tested methodology that has been subjected to peer review/publication, has been shown not to frequently lead to incorrect results, and is accepted in the medical community.  Dr. Newman's testimony establishes, to a reasonable degree of medical certainty, the requisite causal connection between the toxin at issue and the injury—that U.P.'s negligence in exposing Edgett to diesel exhaust over thirty-years of employment—played a part in Edgett's development of cancer.

Dr. Newman's lack of quantitative data is not fatal to the admissibility of his opinion, the lack of such data is typical in epidemiological cases.  Dr. Newman's reliance on qualitative date—including self-reported exposure over thirty years—is appropriate under these circumstances.  Any alleged shortcomings in his evaluation are properly the subject of cross-examination and do not call for exclusion of the testimony.

His opinion that the exposure was *a* cause, not *the* cause, of the cancer, might be less helpful to the jury, therefore less relevant, if the standard of causation were proximate cause. If Dr. Newman were required to establish that Edgett's exposure to benzene was the proximate, or the most probable, cause of Edgett's cancer, his differential etiology analysis might not meet *Daubert's* standards for relevance and reliability. But, under FELA, he is not required to do that.[6]

The Court finds Dr. Newman's opinion on causation has a factual basis and is supported by accepted scientific theories. The record shows Dr. Newman accepted Dr. Perez's methodology. He based his opinion on Edgett's diagnosis in medical records, and Edgett's account of exposure. He also relied on his general experience and readings, general medical knowledge, standard textbooks, and standard references.

The defendant relies in part on the declaration of its expert to discredit Dr. Newman's opinion. If the Court were to accept Dr. Boffetta over that of Dr. Newman's it would be invading the province of the jury.

The Court similarly finds that Dr. Perez's testimony is admissible under *Daubert*. The defendant's criticisms go to the weight, rather than the admissibility of his testimony. Dr. Perez interviewed Edgett's co-workers, reviewed Edgett's employment history and job duties, and performed a literature review. He relied on peer-reviewed studies, including Pronk, in forming his opinion. Dr. Perez's review of the literature indicated that Edgett's exposure was elevated and put him at increased risk. Although Dr. Perez could not determine a specific level of exposure, he stated that based on Edgett's reported

---

[6] Because of the lower standard of proof of causation under the FELA, the defendant's focus on dose-response as integral to the expert's analyses is misplaced. The cases cited by U.P. for that proposition involve proximate cause as the standard of proof of causation.

exposure, his job duties, and the literature, Edgett had a low to intermediate level of exposure to benzene.  His methodology was reasonable in light of his familiarity with industrial hygiene standards.  Dr. Perez has the qualifications and expertise to express an opinion on the railroad's negligence.

Dr. Perez's lack of familiarity or failure to consider U.P. air-quality studies is not a reason to exclude his testimony, but rather an issue to be explored on cross-examination. Also, there is no dispute that Edgett's individual level of exposure was not objectively measured.  Similarly, Dr. Perez's failure to consider evidence of the chemical composition of the diesel fuel used by U.P. is of no consequence because that information would offer only a snapshot of chemical composition of diesel fuel at the moment, and not over the court of Edgett's thirty-year history of employment.

Moreover, the Court finds the defendant's reliance on the exclusion of expert testimony in other FELA cases in this district is misplaced.  First, this Court is not bound by those decisions.  Further, those cases are inapposite.  The cases involved different experts, different diseases, different jobs, and consideration of different factors in the differential etiology analysis.[7]  Also, all of the cases have been appealed.

---

[7] *See, e.g., Byrd v. Union Pac. R.R. Co.*, No. 8:18CV36, 2020 WL 1848496, at *6 (D. Neb. Apr. 13, 2020) (excluding the testimony of Dr. Robert Gale on causation and Dr. Joseph R. Landolph, Jr., on liability for failure to link the plaintiff's exposure as a fireman/engineer to benzene, benzo(a)pyrene, PAHs, nitrated PAHs, and 2, 3, 7, 8-TCDD (dioxin), asbestos, crystalline silica, silica dust, coal dust and formaldehyde in diesel exhaust to the plaintiff's lung cancer and COPD without knowing exposure levels and failing to rule out the plaintiff's two-pack-a-day, forty-year, smoking history as the sole cause of the lung cancer), *appeal docketed*, No. 20-1959 (8th Cir. May 12, 2020); *McLaughlin v. BNSF Ry. Co.*, No. 4:18-CV-3047, 2020 WL 641729, at *6 (D. Neb. Feb. 11, 2020) (excluding the causation testimony of Mark Wilkenfeld, M.D., because the expert failed to adequately rule in diesel exhaust as a cause, however small, of the carman plaintiff's lung cancer and failed to adequately rule out thirty-year, pack-and-a-half-a-day cigarette smoking as the sole cause of the lung cancer), *appeal docketed*, No. 20-1494 (8th Cir. Mar, 10, 2020) *appeal dismissed* (June 19, 2020); *West v. Union Pac. R.R. Co.*, No. 8:17CV36, 2020 WL 531994 at *5 (D. Neb. Feb. 3, 2020) (excluding the causation testimony of Dr. Ernest Chiodo that the plaintiff, a locomotive engineer who had renal cancer, was exposed to a high-level of diesel exhaust as speculation based only on the job the plaintiff held, without reliance on the testimony of an industrial hygiene expert or other facts or data), *appeal docketed*, No. 20-1422 (8th Cir. Mar. 4, 2020); and *Harder v. Union Pac. R.R. Co.*, No. 8:18CV58, 2020

In conclusion, the Court's review of the record shows that the scientific testimony at issue rests on "appropriate validation—i.e., "good grounds', based on what is known," *Daubert*, 509 U.S. 590, and "should be tested by the adversary process with competing expert testimony and cross-examination, rather than excluded by the court at the outset." *Johnson*, 754 F.3d at 562. The experts' opinion are not so "fundamentally unsupported that [the testimony] can offer no assistance to the jury." *Bonner*, 259 F.3d at 929-30.

The methodology employed by the plaintiff's experts is scientifically valid, can properly be applied to the facts of this case, and is reliable enough to assist the trier of fact. *See Daubert*, 509 U.S. at 593-594. This is not the sort of junk science that *Daubert* addresses. Even if there are grounds for some alternative conclusion or flaws in the experts' methods, the expert testimony at issue is within "the range where experts might reasonably differ," and the jury, not the trial court, should be the one to "decide among the conflicting views of different experts." *Kumho Tire*, 526 U.S. at 153.

With the admission of the expert testimony, there is an issue of fact for the jury on the exposure and whether the exposure to certain substances and carcinogens contributed to the decedent's lung cancer. U.P. has not shown as a matter of law that the plaintiff cannot prevail in establishing that U.P.'s negligence "played a part" in Edgett's injury. Accordingly, the Court finds the defendant's motions in limine to exclude Dr. Perez and Dr. Newman are denied.

---

WL 469880, at *1 (D. Neb. Jan. 29, 2020) (excluding expert testimony of Dr. Ernest Chiodo that the railroad machinist's follicular lymphoma (a type of Non-Hodgkin's Lymphoma) was caused by exposure to diesel exhaust, solvents, wielding fumes, and benzenexic substances while working on locomotives because the expert was unaware of the plaintiff's length of exposure, concentration of exposure, and the atmosphere of exposure), *appeal docketed*, No. 20-1417 (8th Cir. Mar. 2, 2020).

The Court also finds that the defendant has not shown that it is entitled to a summary judgment of partial dismissal based on the statute of limitations.  The evidence presently before the Court does not show conclusively that the plaintiff was aware of the crucial fact that his work on the railroad could have caused his lung cancer during the time between his diagnosis in August of 2015 and the limitations date in 2018, so as to be barred by the statute of limitations.  Karen Edgett's deposition testimony is equivocal and/or contradictory at best and establishes only that Mr. Edgett knew some aspects of his work over thirty years may have been bad for his health.  That is different than having knowledge of the fact that exposures at work caused his cancer.  The defendant has not shown that Edgett was ever informed by a doctor, or by anyone, that there was a connection between his work on the railroad and his development of lung cancer.

The evidence shows that the decedent and his wife were not aware that Mr. Edgett's lung cancer possibly had been caused by his employment at the railroad when Mr. Edgett was alive.  There is no evidence that Mr. or Mrs. Edgett would have reasonably known that the cancer diagnosis was connected to Edgett's exposures at work.  The defendant has not shown that there was publicly available information, notoriety, news reports, publicity, or knowledge from other sources that linked lung cancer to the sort of environmental exposures Edgett had, so as to prompt further inquiry.  Also, there is no evidence that a more diligent search would have resulted in different outcome.

Nothing in the record indicates that a reasonably diligent person would have done more to discern the cause, or that a more searching inquiry would have provided Edgett with knowledge of the connection between the cancer and his exposures.  There is no evidence that a timely investigation would have revealed the relationship between

Edgett's exposures at the Railroad and lung cancer. The doctors' responses arguably laid to rest any suspicion the plaintiff might have as to the cause of his injury. The record shows Edgett could not have presumed to know more than the doctors did about the cause of the cancer.

There is no evidence that Edgett acquired any additional information in following years that would trigger a duty to investigate more thoroughly. On this evidence, the Court cannot make a finding as a matter of law that Edgett should have known the cause of the cancer was work-related or that he was not reasonably diligent in investigating the cause. There is a genuine issue of material fact on the plaintiff's reasonable diligence that a jury must resolve. Accordingly, the Court finds the defendant's motion for summary judgment should also be denied.

IT IS ORDERED:

1. The defendant's motions in limine (Filing Nos. 47 and 49) are denied.

2. The defendant's motion for summary judgment (Filing No. 45) is denied.

Dated this 1st day of April, 2021.

BY THE COURT:


s/ Joseph F. Bataillon
Senior United States District Judge

26